IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

VINCENT E. BOYD,

                            Plaintiff,

     v.

CHRIS HEIL, TANIA REINDL,
BRIAN FOSTER, MICHAEL
BAENEN, LT. SWIEKATOWSKI,
and LT. VANDEWALLE,

                          Defendants.

OPINION AND ORDER

17-cv-209-wmc

---

*Pro se* plaintiff Vincent E. Boyd has been incarcerated by the Wisconsin Department of Corrections ("DOC") at the Green Bay Correctional Institution ("GBCI"), where he is serving sentences for two counts of First-Degree Sexual Assault of a Child.  Pursuant to three orders put in place by GBCI on October 15, 2012, as well as subsequent modifications, the above-named defendants and other GBCI officials have been restricting Boyd's ability to exchange non-verbal mail with his mother, Linda Zdeb, as well as his ability to contact his minor daughter, his victims and other minors.  To challenge these restrictions, Boyd filed this lawsuit under 42 U.S.C. § 1983, alleging violations of his rights under the First Amendment of the United States Constitution by named former and current GBCI officials who prevented him from sending certain mail items and punished him for repeatedly attempting to violate the 2012 orders.

Now before the court is defendants' motion for summary judgment.  (Dkt. #47.) Despite the unusual restrictions on communications with defendant's own mother in the 2012 orders, the court finds those orders facially constitutional given her apparent, past

involvement in enabling (if not facilitating) Boyd's sex crimes, her continuing, apparent participation in efforts to facilitate misconduct by defendant that jeopardize both the safety of others and the defendant's rehabilitation, and her continued custody of defendant's minor daughter.  For the reasons explained below, the court further finds that defendants are entitled to judgment in their favor on the merits and on grounds of qualified immunity as to all of Boyd's claims, save two.   The exceptions concern Boyd's First Amendment free speech and retaliation claims against defendants Tony Reindl and William Swiekatowski for withholding Boyd's letter to Zdeb dated August 27, 2013, and punishing him for attempting to send it.  Accordingly, the court will grant defendants' motion in part and deny it in part, dismissing all of Boyd's claims against defendants Chris Heil, Brian Foster, Michael Baenen and Lt. Vandewalle with prejudice.  Since the evidence of record suggests that Boyd may be entitled to judgment in *his* favor with respect to the remaining First Amendment claims against defendants Reindl and Swiekatowski, the court will also set this matter for further briefing on those claims consistent with Federal Rule of Civil Procedure 56(f).

UNDISPUTED FACTS[1]

### A. The Parties

Plaintiff Vincent Boyd has been incarcerated at GBCI since 2012.  Defendants are all current or former employees of GCBI:  Chris Heil has been a social worker since

---

[1]  The court draws the following material facts from the parties proposed findings of facts and responses, along with the cited evidence of record.

November 1996; Tania Reindl was a social worker from August 2012 until May 2016; Michael Baenen and Brian Foster each served as warden at different times since 2012;[2] William Swiekatowski has been a Captain at GBCI since January 2017, before which he was a Lieutenant there from 2002 to 2017; and Vandewalle was a Lieutenant.

In addition, a non-defendant Dr. Steven Schmidt, a licensed psychologist, who supervised GBCI's Psychological Services Unit ("PSU") from June 2005 through November 2015, and from February 2019 to the present, was involved in formulating the three orders restricting Boyd's communications.

### B. Boyd's History of Sex Offenses Against Children

Since defendants' restrictions on Boyd's mail arose out of his history of sexual assaults of children, the court will begin with this criminal history.[3]  In 2000, when he was just 19 years old himself, Boyd was charged with four counts of Second-Degree Sexual Assault of a Child in Langlade County Case No. 00CF113.  The victim, F.M.W., reported that she and her brother were staying at her grandfather's house, and that her cousin Vincent Boyd was staying there as well.  Then only 15 years old, F.M.W. further reported that Boyd had sexual intercourse with her twice, and anal sex with her once.  Subsequently charged with one count of sexual contact, and three counts of intercourse, Boyd pled no contest to the sexual contact charge, and he was placed on 38 months of probation.

---

[2] While not material to this opinion, other than that they did not overlap, the exact dates on which Baenen and Foster each held the position of warden are not disclosed in the record.

[3] Boyd's criminal history also includes multiple convictions for crimes unrelated to sexual assault, but they are not material to Boyd's claims in this lawsuit and are not included in this opinion.

In Cook County Case No. 06CF141270, Boyd was next convicted of violating the sex offender registry and sentenced to 30 months of probation. Boyd's probation from that crime was revoked just one year later, after Boyd was charged in Boone County Case No. 06CF459, with Failure to Report Change of Address. For that charge, Boyd was sentenced to two-and-a-half years in the Illinois prison system and released in July 2008.

Back in Wisconsin, Boyd faced four different charges involving child sexual abuse. On March 27, 2012, in Winnebago County Case No. 10CF344, Boyd was convicted of two counts of First-Degree Sexual Assault of a Child. On June 15, 2012, Boyd was sentenced to 30 years in prison. These charges arose while Boyd was incarcerated in Illinois in 2008. At that time, a victim came forward to report that back in 2003, when she was in first grade, her cousin Vincent Boyd touched her inappropriately as well. The victim explained that she only came forward then because she knew Boyd would be released from prison soon, and she was worried Boyd would try to touch her again after his release. Indeed, it turned out that Boyd had sent both the victim and her twin sister letters from prison that included drawings. One drawing was of a male with his arms around a female with two hearts, and one of the hearts contained the victim's name and the other contained the name "Vincent." At the bottom of the drawing, it said "forever and always." In the other letter, Boyd asked the victim about seeing her curves, and he expressed a desire to spend a lot of time with her after he gets out.

On September 19, 2012, Boyd also entered a plea resolving three different Langlade County cases -- Nos. 06CF16, 08CF240, and 09CF16. Case No. 06CF16 had commenced back in 2006, charging Boyd with failure to report. A bench warrant was issued at that

4

time, but this case remained open until Boyd was arrested in Tennessee in 2010 and extradited to Wisconsin.  Case No. 09CF16 was opened in October 2008, charging Boyd with a sex registry violation, after Boyd stopped reporting to the registry shortly after his release from prison in July of 2008.  Also in October of 2008, Boyd was charged in Case No. 08CF240, with counts for:  (1) First Degree Sexual Assault of a Child, A.L.M.; (2) Child Abuse -- Intentionally Cause Harm; and (3) Felony Intimidation of a Victim.  That criminal complaint alleged that on the September 1, 2005, offense date:  A.L.M. was only 9 or 10 years old and Boyd was 24 years old; A.L.M. claimed that:  Boyd took off his own clothing, then held her down, hit her in the nose, and placed one arm over her chest and mouth; Boyd also put his penis in her vagina; and Boyd told A.L.M. that if she told anyone he would shoot her and her family.  Among A.L.M.'s possessions, her mother found certain notes that suggested A.L.M. and Boyd had a boyfriend/girlfriend "relationship."  A.L.M.'s mother also found a diary in which A.L.M. and Boyd wrote entries to each other, and one from Boyd referenced them having sex and asking A.L.M. if she wanted to do it again. When A.L.M.'s mother confronted him, Boyd allegedly started crying and said he was sorry.

Boyd disputes the events outlined in the complaint for Case No. 08CF240, pointing out that the state dismissed those charges, which is, in fact, correct.  At the same time, there is no dispute that:  the charges were brought based on the above allegations; and the state dismissed the charges in No. 08CF240 in exchange for Boyd pleading guilty in Case Nos. 09CF16 and 06CF459.  Additionally, the terms of Boyd's supervised release in Case No. 06CF45 prohibited Boyd from contacting A.L.M., specifically, and from contacting

any minor females more generally.  The court specifically confirmed that this no contact order extended to Boyd's biological daughter (named "Heaven").[4]

### C. Boyd's Incarceration in Wisconsin

As previously noted, Boyd entered the Wisconsin prison system on June 18, 2012, to serve his sentence in Winnebago County Case No. 10CF344.  While his incarceration started at Dodge Correctional Institution, he was transferred to GBCI on September 7, 2012, where he remains.

On September 12, 2012, defendant Chris Heil was assigned as Boyd's social worker. That same day, GBCI Deputy Warden Sarah Cooper emailed Heil and other staff to advise of Boyd's arrival.  Cooper wanted to alert them because Boyd was a high-profile prisoner, due to his lengthy criminal history and his sexual crimes being featured on America's Most Wanted.  In addition, Deputy Warden Cooper relayed that GBCI's Mail and Property officer found inappropriate pictures in Boyd's mail that same day, including "numerous pictures of a small girl (approximately 3 yrs. of age) in very provocative poses."  (Ex. 1024 (dkt. #53) 5.)  In addition, Boyd's mother, Linda Zdeb, had apparently sent him some 53 photos -- the majority of which were of his own daughter.  Cooper further explained that Boyd's "property was searched and several more of these types of photos were in his possession."

Cooper went on to describe the photos:

---

[4] Although both sides repeatedly refer to Boyd's daughter by her given name in public filings, the court will generally refer to her as "defendant's daughter" or "his daughter."

> In many of the photos, the child is wearing a skirt and is positioned in a manner with her legs spread or up in the air so her panties are showing, there are some where she is removing her pants so her panties are showing, there is one where she is wearing nothing except loose shorts and no top, etc. In some of the photos, it appears that someone put makeup on the little girl and did her hair in a style that isn't usually seen on small children.

(*Id.*)  Although Zdeb now represents that she never sent him sexually provocative photos (*see* Zdeb Decl. (dkt. #41) ¶ 8), Boyd does not dispute the objective description of the photos he received, nor does he dispute that Cooper characterized the pictures as "inappropriate" in her email.  (Ex. 1024 (dkt. #53) 5.)

In the same email, Cooper also reported that Boyd's daughter was being cared for by Zdeb in Tennessee.  While reporting that *Zdeb* did not believe Boyd had committed any sex offenses, Cooper added that staff had listened to Boyd's phone calls with Zdeb, and they had "reason to believe that [Boyd] is asking his mother to take these pictures for him," and that "the mother knows these types of pictures/poses are inappropriate."  (*Id.*)

During Boyd's August 19, 2012, phone call with Zdeb in particular, Boyd asked her to take pictures of Heaven doing the splits.  When Zdeb responded that Heaven could not do the splits, Boyd said "have her try" and asked Zdeb to write on the photo that Heaven was "practicing gymnastics or something," so the photo would be allowed into the prison. (Pusich Decl., Ex. 1012 (dkt. #79-1) 1.)  For all of these reasons, Cooper informed staff that they had confiscated the photos Boyd possessed and planned to contact authorities in Tennessee.  Finally, Cooper explained that Boyd would be placed on a mail monitor, and staff would continue to listen to Boyd's telephone calls.

After learning that Boyd would be on mail monitoring, Social Worker Heil further emailed staff to report that Boyd's mother would also mail him pictures and mark them as

"Legal Mail" when he was at Dodge Correctional Institution, in what was viewed as an attempt to circumvent screening.[5]  Heil also contacted various law enforcement agencies out of concern for Boyd's daughter.  In particular, she spoke with the prosecutor in Langlade County, where Boyd was facing the charges outlined above, who said he would ask the judge to order "No Contact with Any Minors" at sentencing.

### D. GBCI's Orders Related to Boyd's Mail

Ultimately, GBCI Psychological Services, supervisory staff and the Office of Legal Counsel determined that it was both inappropriate and countertherapeutic to Boyd's rehabilitative process for him to possess photos of Heaven or any other likenesses.  (Heil Decl. (dkt. #50) ¶ 25; Schmidt Decl., Ex. 1034 (dkt. #80-1).)  Dr. Schmidt further believed it was countertherapeutic for Boyd to communicate with *any* minors and that his continued ability to communicate inappropriately with any minor girls in particular interfered with his rehabilitation.  (Schmidt Decl. (dkt. #80) ¶ 9.)  More specifically, Dr. Schmidt opined that Boyd's history of sex offenses and his risk of reoffending could be addressed within the DOC by participation in Sex Offender Treatment ("SOT"), but since

---

[5] Boyd purports to dispute this was his intent, claiming that when he was at the Winnebago County Jail, staff had asked him to have his mother write "contains legal material" or "Legal Correspondence" on the envelope if there was any legal research in the envelope.  (Boyd Decl. (dkt. #88) ¶ 19; Ex. 74 (dkt. #88-74) 1-2.)  Still, Boyd does not directly dispute that his mother would inappropriately label mail from her "Legal Mail" as originally set forth in defendants' proposed finding of fact.

Boyd has not enrolled in a SOT program within the DOC, Boyd remains a risk.[6]  Based on Boyd's lack of treatment and criminal record, Dr. Schmidt concluded the potential harm of viewing photos of minor girls and communicating with minor girls outweighed any distress Boyd might experience by being prohibited from these activities.  (Schmidt Decl. (dkt. #80) ¶ 10.)

In response, Boyd claims that there is no need for further rehabilitation, having already served periods of incarceration for his sexual assault crimes, and completed a sex offender treatment program in 2004.  However, there is *no* dispute that:  (1) Boyd had not been enrolled in a sex offender program within the DOC; *and* (2) Dr. Schmidt opined in 2012 that Boyd was not rehabilitated.

On October 15, 2012, therefore, Social Worker Heil issued written orders to Boyd which:  described the photos found in Boyd's cell; noted that Zdeb appeared to have been the person taking, printing and mailing Boyd the photos; and reported that staff had found evidence that Zdeb had assisted Boyd in circumventing the inmate mail system and in placing phone calls inconsistent with prison policies and procedures.  (Heil Decl., Ex. 1008 (dkt. #50-5).)  Heil also reported that GBCI staff had concluded Boyd's possession of photographs of minor children was counterproductive to his rehabilitative process.  Heil further referenced the September 19, 2012, order in Langlade County Case No. 06CF45 that Boyd not have contact with A.L.M. and female minors, as well as the Adjudicatory

---

[6] Although not directly addressed by the parties, SOT programs offered by the DOC are not mandatory but may assist inmates "reduce their custody level and continue their rehabilitation in furtherance of successful reintegration into the community upon release."  *See* https://doc.wi.gov/Pages/AboutDOC/AdultInstitutions/PrimaryTreatmentPrograms.aspx  (last visited Oct. 22, 2020).

Order from the Tennessee Juvenile Court finding by clear and convincing evidence that Boyd sexually abused his daughter's half-brother. (*Id.*)

Based on the above, Heil's orders directed Boyd as follows:

1. You may not have contact with your mother, Linda Zdeb, of any kind, except for written communication that is routed through your social worker.

2. You may not have contact with any minors or victims or their families.

3. You may not possess any pictures, photographs, drawings or likenesses of any minors.

(*Id.*) Heil further advised that "[n]o contact includes but is not limited to written contact, telephonic contact, and third-party contact." (*Id.*) Boyd received Heil's orders that same day, and every year since 2012, a multi-disciplinary team has met to review them. During each annual review, the assigned GBCI multi-disciplinary team discusses whether to modify the orders based on changed circumstances. Even so, these orders have remained in place since October 15, 2012, with few modifications, except for one period of time in which Boyd's mail privileges were almost completely suspended.

As to the latter, on June 6, 2014, Boyd received a conduct report from Lt. Swiekatowski for disobeying orders and making threats. Specifically, that report addressed a letter Boyd sent to his aunt, who is the mother of a victim in his underlying criminal case, which stated that he was "thinking about going to the police department to tell them what she allegedly did to him," was "harassing her," and told her "all the details of the assault [on] her daughter." (Ex. 1021 (dkt. #50-8) 2.) On June 25, 2014, Lt. Vandewalle held a

10

hearing, at which Boyd defended himself by arguing that his aunt was not the victim. Vandewalle found Boyd guilty of both offenses, sentenced him to 180 days in disciplinary segregation, and issued a one-year suspension of all mail privileges, with the exception of attorney/legal mail. Warden Brian Foster affirmed that decision and sentence, including the one-year suspension of mail privileges.

On January 20, 2016, the no-contact order (#1 above in Heil's original, three orders) was also modified to allow Boyd to have limited phone contact with Zdeb, as follows: "The limit to this telephone contact is such that you and your mother are strictly prohibited from discussing any minors (including Heaven B.) and any of your victims or their families." (Heil Decl. (dkt. #50) ¶ 43; Ex. 1025 (dkt. #54).) According to Social Worker Heil, this order was modified because Boyd had not violated the written orders since the previous multi-disciplinary review on June 25, 2015, when the one-year mail suspension ended.

However, on October 26, 2017, the no contact order was changed back again. Specifically, Security Director John Kind ordered Boyd not to have any contact with his mother Zdeb following an August 28, 2017, multi-disciplinary review. During that review, the team discussed Boyd's multiple violations of Heil's written orders, with many violations or other misconduct involving his mother. Discussed below in more detail, those violations included: Zdeb's third-party contact with Boyd's victim A.L.M.; Boyd's receipt of numerous photos that were taken by Zdeb of his daughter; and Zdeb's receipt of money in August 2017 that originated from another inmate (Degner) in exchange for contraband Boyd agreed to deliver to that inmate. Boyd denies that his mother facilitated third-party

11

contact with a victim or sent him photos that were the subject of an August 23, 2017, conduct report.  He further asserts that Zdeb had no knowledge that another inmate was trying to send her money.

On October 9, 2018, Security Director Kind signed off on new orders containing the same restrictions as the previous orders, including no contact with his mother.  On October 15, 2019, Kind again signed off on new orders that contained the same restrictions as his previous written orders.

### E. Social Workers Heil and Reindl's Approach to Monitoring and Denying Boyd's Mail

As social workers at GBCI, defendants Heil and Reindl were responsible for reviewing Boyd's incoming and outgoing mail to his mother.  Heil handled the review when Boyd first arrived at GBCI and was in restrictive housing; Reindl then handled the review once Boyd was in general population and until 2016, when she left GBCI; and from 2016 forward, Heil has been back in charge of monitoring Boyd's outgoing mail.

Between 2012 and 2016, Heil and Reindl approved a large volume of Boyd's mail to Zdeb, as well as Zdeb's mail to Boyd, but they also denied certain communications between the two.  Heil and Reindl maintain that they only denied mail if it violated Boyd's written orders, or some other DOC, GBCI, or DAI policies.  In particular, both attest that they only denied mail between Boyd and his mother when it appeared that Boyd was trying to circumvent the written orders and communicate indirectly with his daughter or other prohibited people such as victims or victim's families.  Because Zdeb is Boyd's daughter's

12

legal guardian, Heil adds that GBCI staff are particularly concerned about Boyd's communications with Zdeb.

Reindl and Heil both attest that their denials of mail serve two purposes.  First, GBCI has an interest in protecting Boyd's daughter, victims, victims' families, and other minors from Boyd.  More specifically, GBCI points to Boyd's history of using the mail to interact inappropriately with -- and grooming -- minors, underscoring the risk to minors were Boyd permitted to communicate with them.  Second, Heil points to Dr. Schmidt's opinion that Boyd should not have contact with minors or access to pictures of his victims or minors out of concern for both the safety of minors and Boyd's rehabilitation.  Not surprisingly, Boyd disputes that the defendants' stated purposes explain their withholding or denying mail between Boyd and Zdeb, claiming that their actions have instead been arbitrary.

Defendants further maintain that Boyd must be monitored carefully because he has frequently attempted to engage in inappropriate communications.  This despite GBCI's written orders, pointing out that Boyd tried to send pictures of himself and messages to his daughter through Zdeb by using multiple mailings.  (*See* Degroot Decl., Exs. 1001, 1002, 1006 (dkt. ##75, 75-1, 75-2, 75-6).)  Heil attests that Boyd tried to send his daughter a note through his brother, solicited a picture of his daughter through a third person, and tried to send a letter to a past victim, A.L.M. (Heil Decl. (dkt. #50) ¶ 37; Exs. 1037, 1038, 1039 (dkt. ##65-67)).

More specifically, on March 21, 2013, Reindl issued Conduct Report 1796234 to Boyd.  The conduct report described a letter Boyd wrote to his mother, dated March 17,

13

2013.  In it, Boyd wrote, "Anyways, Heaven doesn't have to know that I didn't get the painting she did for me.  I know it was great and I love it anyways.  She can know that."  (Reindl Decl. (dkt. #73) ¶ 10; DeGroot Decl. Ex. 1006 (dkt. #75-6) 8.)  Boyd also wrote, "Keep my baby smiling, and let her know I love the painting."  In Social Worker Reindl's view, these statements implied that Zdeb should pass on a message to his daughter from Boyd, which was in violation of the orders.  Boyd was also found guilty of disobeying orders and received a punishment of 61 days loss of recreation and disposal of contraband.  (*Id.*)  Despite his messages' seemingly obvious intent, Boyd also denied any intent to send his daughter a message.

On April 11, 2013, Swiekatowski issued Boyd Conduct Report 2361085 for disobeying orders.  Specifically, Swiekatowski alleged that he was screening a letter Boyd wrote to a woman in Gleason, Wisconsin, stating that:  "My mom has my daughter, Heaven, but because of that, these people screen all of her mail to me and my mail to her []wish to god I had a third party we could write through because she can't send me pictures of my daughter or even drawings.  But other people can.  I just don't know anyone."  (DeGroot Decl., Ex. 1013 (dkt. #77) 6.)  Boyd then wrote that if the woman wanted, she could call his mom, and Boyd told his mom that she might call.  Boyd added, "Ask her to send you a picture of my daughter."  (*Id.*)  After an internal investigation, Boyd was found guilty of disobeying orders and issued a disposition of 180 days' disciplinary separation.

Boyd does not dispute any of this, but still maintains that he was not trying to obtain a picture of his daughter through this third party.[7]

In 2017, Boyd also openly attempted to mail a beaded necklace to his brother.  (Ex. 1037 (dkt. #65) 1-3.)  According to defendants, the necklace was ultimately intended for his daughter because it had an "H" on it and the number 8, which Boyd explained in an accompanying note that (1) they share DNA, and (2) the number 8 is magical because it "is said to go up to Heaven and connect back to earth, thereby, keeping Heaven and earth connected."  (*Id.*)

On August 8, 2017, Lieutenant Swiekatowski further issued Boyd Conduct Report 2977341, alleging that inmate Randy Degner wrote a letter asking his grandmother to mail $250 to Boyd's mother in exchange for Boyd sneaking him stuff every day.  This allegation was based on the results of an August 1, 2017, search of Boyd's cell, during which a sergeant recovered a small bindle of paper that was in Boyd's eyeglass case.  That paper contained a yellow and green capsule, later identified as a controlled medication not prescribed to Boyd.  As such, Boyd was found guilty of misuse of prescription medication and inadequate work or school performance, for which he received 60-days disciplinary separation.

Finally, the August 1st search of Boyd's cell that day also uncovered two sheets of adult pornography and one, hand-drawn depiction of a child in a sexual act.  Heil further attests that the child bore a striking resemblance to Boyd's daughter.  (Heil Decl. (dkt. #50) ¶ 46; Ex. 1040 (dkt. #68) 1-2.)  On August 23, 2017, Heil then issued Boyd Conduct

---

[7] Boyd generally disputes that any of his communications have been inappropriate, claiming he never intended to engage in inappropriate communications, nor did he attempt to contact a victim, since he was never convicted of a crime involving A.L.M.

Report 2823979, which alleged that the search of his cell revealed several items of contraband, including 16 photographs of a young girl, a photocopy of a fax or email or a small photo of children, and an altered picture frame. The conduct report also alleged that the young girl in the 16 photographs were of the same minor, who appeared to be 7 to 9 years old and resembled his 8-year-old daughter. Boyd was subsequently found guilty of disobeying an order and possessing contraband. For this conduct, he received a disposition of 60-days disciplinary separation and 14-days loss of recreation.

### F. Specific Mail Denials

In addition to challenging GBCI's orders restricting his mail generally, Boyd also challenges six, specific instances in which GBCI staff withheld mail he was trying to send to his mother Zdeb, and one instance in which Boyd attempted to send mail to A.L.M.

#### 1. March 13, 2013, Conduct Report 1796229

On March 13, 2013, Reindl denied the delivery of a photograph Boyd sent to Zdeb, issuing him Conduct Report 1796229 for violating and disobeying orders. In the letter, Boyd wrote, "Now, I can't tell you to give this photo to anybody in particular, so it is yours to do with as you please. But let me know if you need another one for your desk or something." (Reindl Decl. (dkt. #73) ¶ 9; dkt. #29-1, at 9.) The letter included a photo of Boyd. Because Boyd's daughter lived with Zdeb, Reindl inferred that the photo would be given to his daughter in violation of the October 15, 2012, orders. Therefore, Reindl denied the letter. On April 4, Lt. Swiekatowski found Boyd guilty at a disciplinary hearing and sentenced him to 30 days of cell confinement, as well as ordered the letter and

photograph be destroyed.  Warden Michael Baenen affirmed that decision and sentence. For his part, Boyd denies that the letter was an attempt to contact his daughter.

### 2.  **April 8, 2013, Conduct Report 1796236**

On April 8, 2013, Reindl denied the delivery of a second letter Boyd sent to Zdeb, issuing Conduct Report 1796236 for disobeying orders and unauthorized use of mail.  In that letter, Boyd wrote, "The picture will be arriving without a letter enclosed.  And you will be receiving all of my mail after this letter.  There is a solution to every problem." (Reindl Decl. (dkt. #73) ¶ 11; Dkt. #29-2, at 4.)  Reindl again surmised that Boyd was attempting to circumvent the orders and communicate with his daughter by sending a photo in a separate mailing.  Lieutenant Swiekatowski again found him guilty of disobeying an order, though not guilty of unauthorized use of mail, and sentenced him to 90 days of disciplinary segregation.   Boyd appealed, and Warden Baenen affirmed Swiekatowski's findings.  Again, Boyd disputes attempting to circumvent the monitoring orders.

### 3.  **August 29, 2013, Conduct Report 1796235**

On August 29, 2013, Reindl next denied the delivery of an August 27 letter that Boyd intended to send his mother, issuing him Conduct Report 1796235 for disrespect and lying.  Reindl based his report on the following portions of his letter:

> So my prison social worker has shown her true colors, after all.  All talk, really.
> I wrote her, explaining that I have no way of knowing whether or not your mail has been routed to her before being delivered to me, and suggested a solution so that contraband was not delivered to me without my knowledge: she could mark the backs of the letters, pictures, etc.
> I know, I know . . . a social worker with as much experience as she *claims* to have - talk is cheap - would acknowledge an obvious problem and take steps to solve that

17

problem.  Well, let me remind you what we're dealing with here [arrow pointing to the words "prison social worker"]. Bingo!  She ignored the problem and sent my letter back to me.

No problem!! :)

Every time I receive a letter from you from now on, I am going to send it right back to her for confirmation that she approved it!! :)

Because I have reason to believe she sent the pictures of Heaven's cake to me, and then claimed she had not approved them.

*That* is the level of professionalism you will find at GBCI.  It's pathetic.

Anyways, resend the pictures so that prison social worker Reindl can re-review them.

(Swiekatowski Decl. (dkt. #74) ¶ 5; DeGroot Decl., Ex. 1011 (dkt. #76) 1-2; Boyd Decl., Ex. 32 (dkt. #88-32).)

According to Reindl, what Boyd wrote about her approving the pictures of Heaven's cake was untrue because she had not allowed him to receive *any* photograph, nor any mail containing photographs that Zdeb had sent him since he became part of her caseload on July 12, 2013.  (Reindl Decl. (dkt. #73) ¶ 15.)  Reindl further attests that in her opinion, Boyd's lying about the processing of his mail was a highly contentious issue for Boyd and GBCI, particularly because of amount of resources GBCI staff were already devoting to reviewing Boyd's mail.  Reindl also felt that allowing Boyd to make false comments about the mail review process was detrimental to his rehabilitation.  (*Id.* ¶ 16.)  Boyd disputes Reindl's characterization of his letter, representing at the time he wrote the letter, that he had "reason to believe" Reindl had reviewed and sent on photos to him without logging her review.  (Boyd Decl. (dkt. #88) ¶ 87; Ex. 32 (dkt. #88-32) 1.)

Lieutenant Swiekatowski held a hearing on this conduct report on September 10,

2013.  At the hearing, Boyd denied lying and stated that he did not think he wrote anything disrespectful.  Swiekatowski found that Boyd lied in claiming Reindl approved and sent the pictures to him but then claimed she had not.  While Swiekatowski dismissed the disrespect charge, he sentenced Boyd to 15 days loss of recreation and disposal of contraband for lying.

Although not set out in his disposition of the conduct report, Swiekatowski now explains his reasoning further in his declaration.  Now Captain Swiekatowski attests that Boyd's lie affected both Reindl's and GBCI's credibility, emphasizing the importance of the former to her ongoing role in reviewing interactions between Boyd and Zdeb.  (*See* Swiekatowski Decl. (dkt. #74) ¶ 7.)  Swiekatowski further states that if Boyd had a problem with the manner in which Reindl was reviewing his mail, he should have raised his concern directly to Reindl, while writing to Zdeb to complain about Reindl trying to set him up could further encourage Zdeb to try to evade the mail review process.  (*Id.* ¶ 8.)[8] However, when Boyd appealed, Warden Baenan dismissed the lying charge as well.

Swiekatowski claims not to know why Baenen dismissed the conduct report, but this was his only involvement in that conduct report.  Moreover, defendant Brian Foster was not working at GBCI at that time, and thus had *no* involvement in this conduct report. Additionally, defendants Foster, Heil and Vandewalle were not involved in any of the

---

[8]  Boyd protests that he *did* try to raise concerns about Reindl -- writing to Reindl, Warden Baenen, and Reindl's supervisor Mr. Mosher about her review process.  (Boyd Decl. (dkt. #88) ¶¶ 92-95.) However, he sent those communications and complaints to these individuals *after* he was issued the conduct report.

events surrounding this conduct report.[9]

Despite the ultimate, complete dismissal of the August 29 conduct report, Boyd nevertheless maintains that letter was never returned to Boyd.  Strangely, Boyd still offers this letter as an exhibit (*see* Ex. 32 (dkt. #88-32) 1), and defendants' position is that even assuming Boyd never received the original letter back, Boyd was free to duplicate and send it in light of the dismissal of the conduct report.

### 4.  **October 14, 2013, Conduct Report 2360244**

On October 14, 2013, Social Worker Heil denied the delivery of a paper rose, dream catcher and letter that Boyd intended to send his mother.  In particular, Boyd attempted to send a crumpled mass of toilet paper resembling the shape of a rose, and a note stating, "Dear Mom, The enclosed rose I made for you.  It was made using nothing but toilet paper and my saliva.  LOL!  I hope you receive in one piece."  (Ex. 1019 (dkt. #50-6) 1-3.)  In Heil's view, the October 15, 2012, orders precluded Boyd from sending "crafts" -- like the rose and dream catcher -- since they did not constitute "written communications."  Heil further believed that Boyd was attempting to manipulate the system by sending his mother crafts.  Accordingly, Heil blocked the letter and issued Boyd Conduct Report 2360244 for disobeying orders.

In defending her decision, Heil also attests that she had to take a firm stance in

---

[9] Boyd claims that Heil was responsible for reviewing Boyd's mail when he was in restrictive housing, but the evidence related to the August 27, 2013, letter suggests that Reindl, not Heil, was responsible for its review.  Since Boyd has offered no admissible evidence of Heil's involvement in reviewing this letter, the court deems it undisputed that Heil had no personal involvement in denying the August 27 letter for purposes of deciding defendants' pending summary judgment motion.

interpreting these orders related to Boyd's mail because, in her view, Boyd may exploit any leniency and create a dangerous situation for his daughter. Further justifying her approach to Boyd sending crafts, Heil had no way of knowing, unlike written communications, whether crafts were actually intended for Zdeb and not his daughter. Still, Boyd disputes that the rose was meant for his daughter and argues that Heil's claimed belief to the contrary was purely based on speculation. Nevertheless, Boyd was found guilty of both charges and sentenced to 240 days in disciplinary segregation. Although defendant Warden Baenen affirmed the conviction, he modified the sentence to 180 days.

### 5.  October 15, 2013, Letter and Drawing

On October 15, 2013, Heil denied the delivery of a letter and drawing Boyd sent to Zdeb, depicting two female statues that were partially clothed. Heil not only concluded that the drawing was not written communications, but also viewed it as yet another of Boyd's attempts to send craft items. Heil further concluded that approving images containing nudity would be contrary to Boyd's rehabilitative efforts to communicate with his mother. Indeed, although Heil also noted that while it was inappropriate for Boyd to alter the frame enclosing the drawing, her *main* reason for denying was that it contained nudity.

Boyd now claims that he copied the drawing from the cover of the novel *Such Devoted Sisters* by Eileen Goudge, which Boyd obtained from the GBCI library. On the letter, Boyd also traced his own hands in the "I love you" sign.

### 6.  April 20, 2016, Letter and Beaded Necklace

21

In April 2016, Boyd attempted to send Zdeb a letter and beaded necklace with the words "I love you" embroidered into the pattern.  Social Worker Reindl determined that this craft also did not constitute a "written communication," and thus, was prohibited by the most recent, applicable order issued on January 20, 2016.  Based on Boyd's past efforts at manipulating the system to try to send messages to his daughter, Reindl believed it important to enforce GBCI's October 15, 2012, orders strictly.  Additionally, Reindl was concerned because she had no way of knowing whether the necklace was intended for his mother, or whether it was another effort to communicate with his daughter.  Therefore, Reindl decided it was appropriate to deny this mail to protect Heaven and to safeguard the integrity of GBCI procedures and restrictions, as well as protect against Boyd using a third party to send the beaded necklace to his daughter.  (Reindl Decl. (dkt. #73) ¶ 18; DeGroot Decl., Ex. 1009 (dkt. #75-9) 10.)  Once again, Boyd disputes Reindl's characterization of the neckless, arguing that it was clearly a form of "written communication," and regardless, he intended it for his mother.  (Boyd Decl. (dkt. #88) ¶ 103.)

### 7.  May 16, 2016, Letter

Finally, on May 16, 2016, Social Worker Heil received a piece of mail from the mailroom for review and possible violation of January 20, 2016, written orders.  Finding the mail included a 10-page letter, dated April 3, 2016, addressed to A.L.M., the victim in Langlade County Case No. 08-CF-240, Heil denied delivery.  In the letter itself, Boyd wrote that he had written to A.L.M.'s mom and dad a few times and sent her mom another letter a couple of years ago.  Heil characterizes this as an admission that Boyd had violated the written orders by contacting the family members of a victim.  (Heil Decl. (dkt. #50) ¶

44; Ex. 1020 (dkt. #50-7) 1-11.)

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Defendants seek judgment in their favor on the merit of all of Boyd's claims or, alternatively, for qualified immunity with respect to his request for monetary damages.

## I.  First Amendment Claims Related to Orders and Refusal to Deliver Mail

Although prisoners have a First Amendment right to send and receive mail, that right is not unqualified. *See Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011); *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). Generally, prison officials may inspect mail for contraband. *See Wolff v. McDonnell*, 418 U.S. 539, 575-77 (1974); Wis. Admin. Code § DOC 309.04 (prison personnel may open and inspect incoming and outgoing mail for contraband). Similarly, if a prisoner's correspondence is found to contain contraband

23

or matters deemed a threat to institutional safety and security, that piece of mail need not be delivered.  *See Koutnik v. Brown*, 456 F.3d 777, 784–86 (7th Cir. 2006) (upholding an outgoing mail restriction on an inmate attempting to send mail containing gang-related symbols and swastikas); *see also* Wis. Admin. Code § DOC 309.04.

In the case of non-legal, *outgoing* mail in particular, the court must determine whether the censorship furthers "one or more of the substantial governmental interests of security, order, and rehabilitation" and is "no greater than . . . necessary or essential to the protection of the particular governmental interest involved."  *Procunier v. Martinez*, 416 U.S. 396, 413 (1974).  In formulating this standard, the Supreme Court recognized that "[s]ome latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty."  *Martinez*, 416 U.S. at 414.  The Supreme Court has also clarified that the "no greater than necessary" standard is not as demanding as the "least restrictive means" standard; the primary question should be whether the restriction actually responded to a "threat to prison order and security" inside the prison.  *See Thornburgh v. Abbott,* 490 U.S. 401, 412 (1989) (citing *Martinez,* 416 U.S. at 412).

In this case, defendants seek judgment in their favor with respect to Boyd's First Amendment free speech challenges to (1) the October 15, 2012, orders generally, (2) the specific applications of those orders by defendants Heil and Reindl in withholding certain letters or items Boyd intended to send Zdeb, and (3) the 2016 attempt by Boyd to communicate with A.L.M.

### A. Facial Challenge to October 15, 2012, Orders

Defendants begin by arguing that that the October 15, 2012, orders satisfy the *Martinez* standard for purposes of censorship of Boyd's outgoing mail, while Boyd argues they fall short under the standard set forth by the Supreme Court in *Turner v. Safely*, 482 U.S. 78 (1987), which held that a prison's restriction on an inmate's speech may be upheld under the First Amendment if it is reasonably related to a legitimate penological interest. *Id.* at 89. Specifically, Boyd ties his arguments to the four factors the Supreme Court considered in *Turner*: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the First Amendment right; (3) what impact accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on that right. *Id.* In Boyd's view, this standard applies to his facial challenge to the 2012 orders encompassing both incoming and outgoing mail.

Boyd is correct that the *Turner* standard would apply to his incoming mail, but the court need not parse out that analysis separately, since the October 2012 orders, and subsequent modifications, pass muster under the more exacting *Martinez* standard. To begin, there is no dispute that Social Worker Heil's initial October 12, 2012, orders were adopted to address GBCI's substantial interests in: (1) protecting Boyd's daughter, his past victims and their families, and other minors from Boyd; and (2) assisting in Boyd's rehabilitative efforts. Nor does Boyd dispute that these are substantial government interests. Regardless, the court accepts that GBCI officials have a substantial interest in

protecting the public, particularly minors and Boyd's victims, from Boyd's re-victimization

or manipulation.  *See Flynn v. Burns*, 289 F. Supp. 3d 948, 963 (E.D. Wis. 2018) (citing

*Lagar v. Tegel*, No. 14-cv-36-wmc, 2016 WL 6990011, at *10 (W.D. Wis. Nov. 29, 2016)

(accepting that prison officials have a substantial interest in protecting the public)); *see also*

*Felce v. Fiedler*, 97 F.2d 1484, 1500 (7th Cir. 1992) (accepting substantial interest in

protecting public from antisocial acts of parolee).  Thus, the central question is whether

the orders are no greater than necessary to address these substantial interests.

As an initial matter, Boyd does not appear to contest the second or third orders,

which prohibit him from contacting any minors, victims or their families, or from

possessing pictures, photographs, drawing or likenesses of any minors.[10]  Instead, Boyd

focuses his challenge on the orders' limiting him to "written communications" with his

mother, Zdeb, after screening by his social worker.  Defendants argue that this restriction

is generally necessary to protect his daughter, who lives with Zdeb, and assist in Boyd's

rehabilitation, particularly given concerns that Zdeb's behavior may have facilitated

inappropriate interactions between Boyd and his daughter.  Indeed, Deputy Warden

---

[10] To the extent Boyd would challenge those orders, they satisfy the *Martinez* standard given the substantial governmental interests of protecting minors and rehabilitating Boyd, his history of sexually assaulting minors, and his past uses of the mail to communicate inappropriately with minors.  For example, in 2008, Boyd sent a victim a drawing that appeared to be him and her embracing, with the note "forever and always," and then later wrote that he wanted to spend a lot of time with her when he got out.  Furthermore, Dr. Schmidt found it problematic that Boyd had not participated in Sex Offender Treatment within the DOC, concluding that because he has not completed sex offender treatment, the potential harm of communicating with minor girls outweighs the distress Boyd would experience from being prohibited from such communications.  Although Boyd claims he needs no further rehabilitation because he completed a sex offender program in 2004, Dr. Schmidt formed this opinion about Boyd based on behavior *since* 2004.  Accordingly, the evidence of record establishes that the orders prohibiting contact with, or possession of photos of, minors further the state's interests in the safety of minors and Boyd's rehabilitation.

Cooper reported that Zdeb did not believe Boyd committed any sex offenses (Ex. 1024 (dkt. #53) 5), and it is undisputed that in 2012, Zdeb had mailed Boyd *53* photographs of his then three-year-old daughter.  Even more disturbing, Deputy Warden Cooper observed that in those photos, she was posed in sexually suggestive or provocative positions and dressed to look more mature.  Finally, during a telephone conversation with Zdeb, Boyd requested photos of his daughter doing the splits, commenting that Zdeb could write she was doing gymnastics.

Despite these well-founded concerns, Boyd's argues that the prohibition on him sending anything but "written communications" to Zdeb is the type of overbroad restriction the Supreme Court warned against in *Thornburgh*.  In *Thornburgh*, however, the Court suggested that while the *Martinez* standard might require a "close fit between the challenged regulation and the interest it purport[s] to serve," it does *not* include a "least restrictive alternative analysis."  *See* 490 U.S. at 410-11, 413 (quotation marks omitted).  In any event, the order limiting Boyd's communications with Zdeb *is* quite narrow, circumscribing the *types of communications* that Boyd may have *with just one person* (Zdeb).  Plus, by Boyd's own account, he was still able to communicate extensively with Zdeb in writing on other topics.  Even accepting that the limits on Boyd's ability to send non-written communications is broad, defendants cite good reasons for the breadth of this restriction given Boyd's disturbing relationship with his mother (Zdeb) *and* Boyd's and Zdeb's even more disturbing relationship with is daughter.  At least as long as Boyd's daughter is living with Zdeb, the GBCI defendants have ample reason to restrict their communications, especially when Boyd had previously solicited pictures of his daughter

and asked Zdeb to have his daughter write to him -- the latter despite the express prohibition against his having contact with any minors, or possessing photos of minors, *including* his daughter.   Equally problematic, *Zdeb* appeared to prison officials to be acquiescing in Boyd's requests, and possibly even facilitating contact between Boyd and his daughter.

Boyd further argues that this order precludes him from sending *any* photos, even "innocent" ones, such as pictures of her house, pets or artwork.   However, as administrators, mental health providers and social workers responsible for prisoner rehabilitation and public safety, GBCI staff are entitled to "particular deference and latitude." *See Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977), and *Martinez*, 416 U.S. at 414)); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (courts must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"). As such, "prison administrators are not required to 'show with certainty that adverse consequences would follow from a failure to [act].'" *Rios*, 812 F.2d at 1037 (quoting *Martinez*, 416 U.S. at 413).

Defendants acknowledge they cannot prove with certainty that every photo or object Boyd might send Zdeb is intended for his daughter to receive.   Still, they point out that Zdeb had shown poor judgment in the past about sending Boyd photos and had seemed inclined to assist Boyd in doing the same with his daughter.   In response, Boyd

claims that an obvious, less restrictive alternative to the prohibition on all non-written material would be to simply have the social worker review the photos or craft items he wishes to exchange with Zdeb, but given the amount of communications between Boyd and Zdeb, defendants insist that this would require social worker Heil or Reindl to review carefully *every* photo or craft they exchange for possible images, messaging, symbolism or hidden meaning regarding his daughter, victims or their families, and other minors. Accordingly, defendants maintain that it was necessary for GBCI to instead prohibit Boyd and Zdeb from exchanging photos *and* crafts altogether.

As support, defendants point to *Ware v. Randolph*, No. 07-3013, 2008 WL 4390315 (C.D. Ill. Sept. 24, 2008), in which a district court upheld an institution-wide prohibition on drawings and messages on outgoing envelopes. *Id.* at *7. In *Ware*, the court upheld the restriction because it allowed mail room staff to avoid making judgment calls about whether a drawing or message created a security issue, a process that can be "labor intensive and time consuming." *Id.* However, the *Ware* court addressed an institution-wide restriction, rather than the mail exchange between *one* prisoner and *one* intended recipient. One could more readily understand the burden presenting by having to screen the outside of *all* prisoner envelopes for writings or drawing for security issues. In contrast, while it is undisputed that Boyd and Zdeb exchange a "substantial" amount of mail, the record does not reveal how much of a time commitment would be required to review all of their exchanges. As such, the court cannot readily conclude that requiring a social worker to screen all, non-written communications between Boyd and Zdeb is overly burdensome.

In addition to the fact that Boyd and Zdeb exchange a significant amount of mail,

defendants point out that social workers Reindl and Heil have *no* way of knowing whether Boyd intends for pictures, craft items or other non-written communications to go to Zdeb or his daughter.  Therefore, they have concluded that the surest way to ensure compliance with the no contact order -- thereby fostering Boyd's rehabilitation and the safety of his daughter -- is to limit Boyd's exchanges with Zdeb to written communications only. Although Boyd suggests that this prohibition is based purely on conjecture, it is undisputed that Boyd has already attempted to use various means of communicating with his daughter in ways that would circumvent GBCI's order.

Finally, Boyd suggests that another alternative to the order would be to allow him and his mother to exchange photos and other non-written material, but limit the number of mailings to two or three per week.  While Boyd argues that this alternative would reduce the burden on social workers Heil and Reindl of screening a large amount of mail between him and his mother, it does not address how this alternative would alleviate the concern that social workers would be unable to determine Boyd's intended recipient, Zdeb or his daughter.  Of course, defendants also remain concerned that Boyd would still send large *volumes* of documents, crafts or photos in each mailing.

Boyd rightly points out that the current prohibition thwarts his ability to communicate in various non-verbal ways with Zdeb, but the *Martinez* standard is not a "least restrictive means" test.  *Thornburgh*, 490 U.S. at 411.  Moreover, Boyd's and Zdeb's past behavior put GBCI officials in an extremely challenging position in terms of striking the right balance between protecting Boyd's daughter and his need for rehabilitation as well as his constitutional rights.  Indeed, GBCI officials understandably felt they were left

with little choice than to draw a hard line when confronted by the unusual combination of inmate Boyd -- who had a history of sexual assaults and communicating with his victims through the mail using pictures and artwork -- and his mother Zdeb -- who had custody over Boyd's then three-year-old daughter and appeared willing to help Boyd violate the no contact order.   Given that the prohibition on non-written communications is a *direct* response to Boyd's attempts to have prohibited contact with his daughter (and other minors, victims or their families), the court agrees with defendants that consistent with *Martinez*, it goes no further than necessary to address GBCI's substantial interests in Boyd's rehabilitation and the safety of the minors, at least when implemented.

Defendants also argue that:  (1) the restriction on Boyd's communication with Zdeb continues to be necessary; and (2) the subsequent modifications to the October 15, 2012, orders stand on even firmer ground in light of Boyd's continued efforts to contact his daughter and possess sexually suggestive photos or pictures of minors.  Specifically, since 2012, there have been several occasions in which GBCI staff have reasonably concluded that Boyd was attempting to circumvent court-imposed prohibitions on contact with his daughter by communicating cryptically with Zdeb.  Those instances included:  the April 2013 letter that Boyd attempted to send to a third-party, which appeared to be seeking a way to get a picture of the daughter (Ex. 1013 (dkt. #77) 6); a March 2013 letter Boyd tried to send Zdeb in which he commented that his daughter "can know" that he loved her painting, even though he did not receive it and to "let her know I love the painting" (Ex. 1006 (dkt. #75-6) 8); and the 2017 letter that Boyd sent his brother, enclosing a necklace with an "H" and a note about "Heaven and earth" being connected (Ex. 1037 (dkt. #65)

1-3).  Defendants also point out that the subject prohibitions are reviewed on an annual basis; and in fact, they became less restrictive in 2016, when the 2012 orders were adjusted to allow Boyd to speak to Zdeb over the phone because he had shown improvement.  It was only when it became apparent to GBCI staff that Boyd was attempting to contact one of his victims (A.L.M.) through his mother that *all* communication with Zdeb was prohibited.  Finally, the court would be remiss in ignoring the August 2017 search of Boyd's cell, which recovered, among other problematic items, 16 photographs of a young girl, a photocopy of what appeared to be a small photo of children, and one hand-drawn depiction of a child (who appeared to social worker Heil to be of his daughter) engaging in a sexual act.  (Heil Decl. (dkt. #50) ¶ 46; Ex. 1040 (dkt. #68) 1-2.)

Obviously, all this evidence suggests that Boyd is far from rehabilitated, remains a risk if allowed to communicate with his minor daughter, past victims, or other minors, and thus, the 2012 orders continue to be necessary to further GBCI's interests in protecting minors and rehabilitating Boyd.  Should that change, Boyd's first avenue to modify the orders should be his social workers and then the annual review, not a federal court. Accordingly, the court concludes that the orders, in their past and current iteration, meet the *Martinez* standard.

### B.  Specific Mail Denials

#### 1.  March 13, 2013 letter and conduct report 1796229

Given the greater leeway GBCI officials should be entitled in implementing the 2012 orders, the court is hesitant to devote substantial, additional attention to Boyd's

challenges to specific communications and conduct reports, particularly in light of their right to qualified immunity in drawing distinctions in the permissibility of one-off communications. However, the court will do so here in the hopes of providing guidance to Boyd and GBCI officials as to where the line should fall between permissible and impermissible communications, however grey it may be at the margins, *and* in recognition of Boyd's efforts to preserve his right to challenge the specific conduct reports. Even so, the court worries that in doing so, it may be encouraging Boyd to continue to push the limits, rather than focus on his own rehabilitation. Accordingly, he should not expect such detailed analysis going forward absent a clear violation of his First Amendment rights.

The first specific denial Boyd challenges involves his March 13, 2013, letter to Zdeb, in which he included a photo of himself and referenced Zdeb's ability to do with it as she pleased. Boyd insists that he intended the photo to be for Zdeb alone, but his sworn statement about his intent does not create a genuine dispute of fact with respect to whether defendant Reindl was justified in her belief that Boyd's crypt language suggested an intent that Zdeb pass the photo on to his daughter. Indeed, Boyd does not even attempt to explain *why* he would use that language, other than stating that Zdeb might want a photo of him for home and office. However, Boyd does not explain why he did not simply write as much in his letter. Given Boyd's not so hidden agenda to bypass the prohibition on having contact with his minor daughter, Reindl cannot be faulted for finding his language suspicious.

Boyd also argues that defendant Reindl had allowed other photos and drawings he sent to be passed on to his mother. However, Boyd does not point to any allowance Social

33

Workers Reindl or Heil made that included a letter with this type of suspicious suggestion. And even if Reindl or Heil were inconsistent in the manner in which they enforced this prohibition, it would be understandable given their undisputed representation that Boyd and Zdeb exchanged so much mail.  Regardless, an inconsistent application of rules does not establish that the March 13, 2013, denial was not intended to further GBCI's substantial interests.  *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ("the deference we afford prisons permits . . . inconsistencies") (citing *Thornburgh*, 490 U.S. at 417 n.15). To the contrary, the fact that Reindl or Heil allowed other photos or drawings to be mailed suggested that they may have erred on the side of allowing Boyd to communicate *more* with Zdeb than the orders allowed, rather than less.  In this way, any arguable evidence that Heil and Reindl allowed Boyd to send other drawings and photos suggests that they were making a concerted effort to apply the prohibition thoughtfully by reviewing Boyd's mailings within their specific contexts, rather than arbitrarily enforcing the order. Accordingly, Reindl is entitled to judgment in her favor with respect to the March 13, 2013, mail denial.

### 2. April 8, 2013 letter

Defendant Reindl's decision to intercept Boyd's April 8, 2013, letter is even more clearly justified.  To start, the language alone readily draws suspicion.  Boyd wrote that he would be sending a photo of himself "without a letter enclosed," noting that:  "There is a solution to every problem."  (Reindl Decl. (dkt. #73) ¶ 11; Dkt. #29-2, at 4.)  This language, coming within a month of the denial of the March 13, 2013, letter that enclosed a picture, reasonably caused Reindl to conclude that Boyd was attempting to circumvent

34

not only the order generally, but her recent denial of a letter with the photo.

Moreover, as of April 8, 2013, Reindl had another piece of information that could have reasonably led her to believe that Boyd was trying to communicate with his minor daughter:  On March 21, 2013, Reindl had issued Boyd Conduct Report 1796234 for disobeying orders based on Boyd's letter to Zdeb, in which he specifically wrote that even though Boyd was denied access to a painting his daughter made, Zdeb should let her know that he loved it.  (Ex. 1006 (dkt. #75-6) 8.)  As of April 8, therefore, Reindl had dealt with two, recent occasions in which Boyd used language that either suggested another person might be able access a prohibited photo (on March 13), or explicitly encouraging a prohibited contact with his daughter (March 21).

Nevertheless, Boyd again claims that Reindl was merely speculating based on her allegation that Boyd had used "another source to have 3rd party contact" with his daughter. (*See* Ex. 1002 (dkt. #75-2) at 4.)  Specifically, Boyd presented evidence during the conduct report hearing on his April 8 letter that he had not actually purchased another photo of himself to send, which he claims rebuts Reindl's belief that Boyd was using a third party to have contact with his daughter.  However, even if credited, this evidence only tends to show that Boyd may not have followed through with the purchase of a photo of himself, *not* that defendant Reindl lacked a basis to suspect Boyd of attempting to contact his daughter.

Furthermore, it is worth noting that defendant Swiekatowski held the conduct report hearing on April 23, 2013.  (*Id.* at 6.)  By *that* time, Swiekatowski had also issued Boyd Conduct Report 2361085, for writing to the woman in Gleason, Wisconsin,

complaining to her about the screening of his communications with Zdeb, expressing a wish he had a "third party" he could write through, telling her she could ask Zdeb for a photo of his daughter, and trying to connect this woman to his mother. (*See* Ex. 1013 (dkt. #77) 6.)  While it is unclear from the record whether defendant *Reindl* knew about this conduct report in screening his April 8 letter, but it is more than reasonable to infer that Swiekatowski was aware that Boyd had contacted a third party and discussed a photo exchange.  Accordingly, Reindl's original denial, as well as Swiekatowski's upholding the related conduct report, furthered GBCI's interests in protecting Boyd and his daughter, particularly since Boyd's contacts with his daughter had been found countertherapeutic.

### 3. **August 27, 2013, letter**

The result is different with respect to defendant Reindl's denial of Boyd's August 27, 2013, letter to Zdeb. The record strongly suggests that Reindl did not deny the letter out of concern that Boyd was attempting to circumvent the 2012 orders (or otherwise take action that ran contrary to his rehabilitation).  Instead, Reindl apparently denied it because she believed Boyd lied and made disrespectful comments about her.  In particular, Boyd complained to his mother that Reindl had approved pictures of his daughter's birthday cake but then later denied that she had approved them, suggesting she had acted unprofessionally.  In Reindl's view, Boyd's false and disrespectful statements would adversely impact her credibility specifically, as well as the integrity of GBCI officials generally.  Additionally, Reindl suggests that Zdeb could attempt to use the fact that Reindl acted inappropriately to circumvent the mail review process in the future, which may implicate GBCI's interests in security and protecting the public.

36

However, Reindl does not actually connect the dots by explaining *how* Zdeb could have used Boyd's statements in a manner that would create a safety or security risk within GBCI or to the public generally.  In fact, there is no obvious connection between this letter and those interests.  Given the context in which Boyd sent the letter, it is doubtful that Boyd's statements could even create an opening for Zdeb to endanger institutional safety or security.  As Boyd points out, he was only directing Zdeb to resend the photos for Reindl to review, and Reindl does not assert nor does there appear room to argue that this statement was some sort of coded suggestion that Zdeb should intentionally violate the 2012 orders.  Furthermore, these orders remained in place, and Reindl and Heil continued to review Boyd's incoming correspondence from Zdeb.  Reindl does not even explain exactly *how* Zdeb's receipt of Boyd's false and unflattering statements about her might create an opening for a security or public safety risk that could not have been addressed by the orders already in place.  At most, Zdeb might make Reindl's job more difficult by sending more mail, but there is no basis on this record to conclude that an influx of mail from Zdeb created a security or safety risk within the institution, or otherwise implicated a substantial governmental interest, however frustrating, offensive or burdensome that might be.

Reindl's failure to explain the link between Boyd writing or Zdeb reading this letter and a safety or security concern is more than just problematic, since what appears to remain is Reindl's concern that Boyd was attacking her integrity and credibility generally, and it is well-established by *Martinez* and its progeny that prisons do *not* further substantial interests by restricting embarrassing or unflattering speech.  *See Martinez*, 416 U.S. at 416

37

(striking regulations allowing censorship of complaints, grievances and inflammatory political and racial views); *see Carter v. Radtke,* No. 10-CV-510-WMC, 2014 WL 5494679, at *16 (W.D. Wis. Oct. 30, 2014) (finding a violation of First Amendment rights based on censoring outgoing mail based on disparaging statements and citing cases in support); *see also Koutnik v. Brown*, 396 F. Supp. 2d 978, 985 (W.D. Wis. 2005), *aff'd*, 189 F. App'x 546 (7th Cir. 2006) ("[R]egulations that allow censorship of merely embarrassing or unflattering speech do not further the government's substantial interests related to security or rehabilitation.").

Indeed, in *Kalafi v. Brown*, No. 16-cv-847-slc, 2018 WL 1660732 (W.D. Wis. Apr. 5, 2018), defendants' similarly failed to connect any interests in prison security, order, or rehabilitation to the mailing of unflattering or false statements about prison staff. In *Kalafi*, the plaintiff sent an article containing various allegedly false statements about prison officials, and he was charged in a conduct report with making false statements. *Id.* at *9. Defendants' position was the same as it is here: Kalafi's false statements adversely affected the integrity of the institution. Yet the court concluded that defendants "failed to show that their decision to punish Kalafi for the statements made in his article furthered" the institution's interests in prison security, order or rehabilitation. *Id.* Defendants do not mention this decision, much less attempt to distinguish it, but the same principle would appear to apply. While Reindl attests that Zdeb might be able to use Boyd's statements to circumvent the mail procedures, which appears to be an effort to tie in the interests in prison security and public safety, what Reindl has left unaddressed is exactly -- or even vaguely -- *how* those interests are implicated by her receipt of this letter. Accordingly, on

38

this record at least, Reindl's denial of Boyd's August 27, 2013, letter to his mother does not appear to satisfy the *Martinez* standard.

Perhaps recognizing this weakness, defendants also argue that Reindl's denial was only temporary, since Boyd was free to re-write it once Baenen dismissed the lying charge, relying on *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999), for the proposition that a short delay in sending mail does not establish a First Amendment violation. *Id.* at 782. In *Rowe*, the court noted that "relatively short-term and sporadic" delays, and delays that were not "content-based," would not be enough to support a First Amendment claim. However, Reindl denied the August 27 letter, based on its content, while the conduct report was not dismissed until October 14, a month and a half later. Thus, even assuming Boyd could replicate the letter once the conduct report was dismissed, the delay was substantial, was not a mistake, and was clearly withheld due to the content of the letter; and as such, the principle from *Rowe* simply does not save the constitutionality of Reindl's decision to deny sending the letter. Accordingly, defendants are not entitled to summary judgment on the merits of this claim.

For much the same reason, Reindl would also not be entitled to qualified immunity from monetary damages with respect to this claim either, however meager they might be. Qualified immunity "protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the

plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).  Moreover, the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)).  Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted).  Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

In August of 2013, it was already clearly established that the First Amendment prohibits censorship of unflattering and false statements about prison officials, and the censorship of *outgoing* mail must be necessary to further the interests of prison security, order or rehabilitation.  Since defendants have not come forward with evidence of a connection between withholding the August 27, 2013, letter and those interests, Reindl is not entitled to qualified immunity with respect to this denial.  In fact, it appears that because there are no factual disputes with respect to what Boyd wrote, or why Reindl denied the contents of the letter from going to Zdeb, *Boyd* might be entitled to judgment in his favor with respect to this particular denial.  As contemplated by Rule 56(f), therefore, the court will provide both parties the opportunity to submit any additional law or facts related to this claim before deciding the issue.

### 4.  October 14, 2013, letter, rose and dreamcatcher

40

Next, Boyd challenges defendant's Heil's October 14, 2013, denial of a rose made out of toilet paper and saliva, a dream catcher and a short note stating that he made the rose for her.  Heil provides two bases for refusing to allow these items to be sent:  she believed that the rose and dream catcher were not "written communications" that were allowed by the October 15, 2012, orders, and both craft items and the short written explanation were attempts by Boyd to circumvent the orders based on his previous attempts.  Heil further explains that she took a strict approach to enforcing the orders with respect to these craft items in particular, because:  (1) Boyd might try to exploit any opportunity to circumvent the prohibition against non-written items, and (2) she had no way of knowing whether Boyd *actually* intended the crafts for Zdeb, as opposed to his daughter.  Indeed, while Heil could read and review written communications to Zdeb for potential attempts to contact his daughter, Heil was concerned that craft items like the rose and dreamcatcher were not as easy to interpret.  Due to Boyd's previous letters and communications suggesting an intent to get in touch with his daughter in some way, and granting the deference to which she is entitled, Heil had a sound basis to conclude that Boyd had just taken a different tack by using craft items.

Still, Boyd argues that he was allowed to send various "hobby" items to his mother.  (*See* Exs. 8-10 (dkt. ##88-8, 88-9, 88-10); Ex. 12 (dkt. #88-12) 1; Ex. 13 (dkt. #88-13) 3; Ex. 14 (dkt. #88-14) 3; Ex. 15 (dkt. #88-15) 3-4; Ex. 16 (dkt. #88-16) 5; Ex. 17 (dkt. #88-17) 2.)  Defendants point out, however, these items consisted of pictures and drawings that Boyd sent along with or embedded within letters to Zdeb, not separate items that could easily be passed to his daughter.  Moreover, examples of other instances in which

41

Boyd was allowed to send hobby items does not establish that Heil's denial of these craft items did not serve to protect his daughter from Boyd and address Boyd's need for rehabilitation.  Finally, as previously noted, the *Martinez* standard does not require prison officials to prove that the risk they perceive would *actually* occur.  *See Rios*, 812 F.2d at 1037 (quoting *Martinez*, 416 U.S. at 413).  Rather, what is necessary is that Heil exercise professional judgment to conclude that preventing Boyd from sending the rose and dreamcatcher was necessary to serve his rehabilitation needs or protect his daughter.  Given Heil's observation that Boyd took efforts to circumvent the orders and have prohibited contact, it is apparent that this denial furthered those interests, even absent conclusive evidence that Boyd intended those items to reach his daughter.

To the extent this denial is a close call, Heil is also entitled to qualified immunity.  Boyd has not directed the court to any Supreme Court or Seventh Circuit case law concluding that he had a clearly established right to send non-written communications to the home in which a person he was prohibited from contacting lived.  Therefore, even assuming that the denial did not meet the *Martinez* standard, Heil would not have fair notice that her decision violated Boyd's established First Amendment rights.

### 5.  October 15, 2013, letter

Heil also denied Boyd's attempt to send Zdeb a letter and drawing of two, partially clothed female statues.  Similar to the denial from the day before, Heil concluded that the drawing did not constitute "written communication."  With respect to these drawings in particular, Heil also believed that allowing Boyd to communicate with his mother using images containing nudity would be contrary to his rehabilitative needs.

In opposition, Boyd claims that this denial was not necessary to further any substantial interest, since Reindl allowed him to send Zdeb the exact same drawing a few months later, on January 22, 2014.   (*See* Ex. 19 (dkt. #88-19) 1-2.)   Again, this inconsistency does not establish that the denial was not necessary to serve GBCI's substantial interests of protecting his daughter and fostering his rehabilitation.   Even less persuasive, Boyd appears to be suggesting that by 2013, GBCI no longer had an important interest in Boyd's rehabilitation.   In support, Boyd insists that he completed a sex offender program back in 2004, ignoring that his incarceration at GBCI in 2012 suggested that his sexual interest in minors continued.   Indeed, in September 2012, Boyd possessed 53 photos of his minor daughter in various provocative and inappropriate positions, and then he continued to attempt to contact or obtain photos of her.   Additionally, and significantly, Dr. Schmidt had opined that Boyd continued to pose a threat to minors and was *not* rehabilitated.   Accordingly, on this record, the court finds Heil's refusal to allow Boyd to send drawings containing nudity to his mother was no greater than necessary to further GBCI's interest in fostering Boyd's rehabilitation.

### 6. April 2016 beaded necklace

The next denial Boyd challenges concerns defendant Reindl's April 2016 decision preventing him from sending Zdeb a necklace bearing the words, "I love you."   In January of 2016, the 2012 orders had been modified to allow Boyd limited phone contact with Zdeb, but the orders still only allowed written communication between Boyd and Zdeb, not gifts.   Boyd challenges the denial, arguing that the three-word message on the necklace constituted a "written communication."   While Reindl's stated reason for denial at the

43

time was that the necklace did not constitute a "written communication," she also attests concern that the necklace was just Boyd's latest effort to manipulate the system and send a message to his daughter.

Boyd again claims Reindl's basis for denial is purely speculative, citing to *Koutnik v. Berge*, 20014 WL 1629548 (W.D. Wis. July 19, 2004), which found defendants' justification for the censorship and punishment to be speculative. More specifically, Judge Crabb concluded that prison officials violated a plaintiff's First Amendment rights in refusing to send a letter and punishing the prisoner for signing it using a nickname. Although the defendants claimed that the use of the nickname could be a coded way to convey criminal plans, the court faulted defendants for failing to come forward with *any* evidence supporting their suspicion. *Id.* at *8.

Certainly, Boyd correctly cites to *Koutnik* for the proposition that defendants must come forward with some evidence to support their position. *See Shimer v. Washington*, 100 F.3d 506, 509-10 (7th Cir. 1996) (under *Turner*, "the prison administration must proffer some evidence to support its restriction of . . . constitutional rights") (citations omitted); *DeMallory v. Cullen*, 855 F.2d 442, 448 (7th Cir. 1988) ("[P]rison officials must come forward with evidence that the specific contact in issue threatens security and must show that less restrictive measures . . . are not possible."). Unlike in *Koutnik*, however, defendant Reindl's denial was based on evidence, including Boyd's history of manipulating the mail system and attempting to send prohibited messages to his daughter.[11] Again, in 2012 Boyd

---

[11] Reindl also relies on the fact that the following year Boyd attempted to send his daughter a necklace with both an "H" and the number 8 on it, along with a note saying that "Heaven and earth" are connected. (Ex. 1037 (dkt. #65) 1-3.) Although this evidence certainly suggests that

44

received from Zdeb dozens of sexually suggestive photos of his daughter; and in 2013 alone, Boyd mentioned his daughter in communications to Zdeb, told Zdeb to tell her that he loved her painting, and reached out to a third party, suggesting that she assist him in communicating with Zdeb.   On this record, Boyd's insistence that his motives were innocent is not sufficient to diminish the reasonableness of Reindl's concern that Boyd might be attempting to circumvent the order prohibiting him from contact with his daughter.

Boyd also argues that Reindl has essentially backed into this justification for the denial, since during the inmate complaint process Reindl's only justification was that the necklace did not constitute a "written communication."   In support, Boyd again cites to *Koutnik,* 2004 WL 1629548, because the court rejected defendants' argument that the plaintiff may have been using code, since the plaintiff was censored and punished *solely* for using that nickname, not based on any concern for a code.   *Id* at \*8.   Unlike in *Koutnik,* Reindl is not manufacturing a *new* reason to justify the denial, but merely detailing *why* she deemed the necklace a prohibited written communication.   In particular, Reindl's reasoning is relevant to the question of whether the denial was generally necessary to further the substantial interests in Boyd's rehabilitation and preventing Boyd from contacting his daughter.   Given Boyd's demonstrated efforts to contact her through his mother, Reindl's reason for strictly enforcing the 2012 orders stands on solid ground.

---

Boyd was trying to send his daughter the necklace in 2017, it is not relevant to Boyd's actions in 2016, or at least not to Reindl's impression at that time as to whether Boyd was attempting to circumvent the January 20, 2016, orders.

Accordingly, Reindl's decision not to mail the beaded necklace did not violated Boyd's First Amendment rights. Similar to Heil's denial of the paper rose and dream catcher, Reindl would also be entitled to qualified immunity from monetary damages for this denial, since Boyd cannot cite to any authority suggesting that Boyd had a clearly established right to send the necklace to Zdeb, so long as his daughter was also living there.

### 7. May 24, 2016 denial of mail intended for A.L.M.

Finally, Boyd claims that Heil's denial of the 10-page letter intended for A.L.M. violated his First Amendment rights because she was *not* a victim to one of his crimes of conviction. Boyd is correct to the extent that the charges in Case No 08-CF-240 were dismissed, but it is undisputed that A.L.M. had accused Boyd of sexually assaulting her when she was 9 or 10 years old. Nor does Boyd dispute that the court ruled, as a condition of supervision in the two other cases in which he pleaded guilty, Boyd *was* prohibited from contacting A.L.M. Even though Boyd was not *convicted* of the crimes charged in Case No. 08-CF0240, therefore, there is no question that Heil's decision to block the letter to A.L.M. furthered the substantial interests in Boyd's rehabilitation *and* protected the safety of the public. Even more absurd, Boyd argues that GBCI went beyond its authority because his no contact order with respect to A.L.M. would only start upon his release from incarceration; and in 2014, Reindl supposedly told Heil that the DOC did not have jurisdiction over cases that had expired. (Ex. 57 (dkt. #88-57) 3.) However, the timing of any no contact order does not *preclude* Heil from reasonably considering A.L.M. to be one of Boyd's victims, much less from reaching the conclusion that denying him the ability to send A.L.M. a letter furthered the GBCI's substantial interest in the safety of the public

46

and in Boyd's rehabilitation.

In both *Martinez* and *Thornburgh*, the Supreme Court emphasized that courts may not substitute its own judgment in reviewing decisions of prison officials who are tasked with the "difficult and delicate problems of prison management." *See Thornburgh*, 490 U.S. at 407; *Martinez*, 416 U.S. at 405 (when a state penal system's restrictions are involved, federal courts have even greater reason to accord deference to prison authorities). Ultimately, defendant Heil made a judgment call that it would be counterproductive to Boyd's rehabilitation and potentially damaging to A.L.M. to allow his communication to go through. Since this judgment appears well founded and no evidence of record calls it into question, the denial did not violate Boyd's First Amendment rights. Indeed, to the extent it would be a close call, Heil would again be entitled to qualified immunity. *Flynn*, 289 F. Supp. 3d at 963 (prison officials entitled to qualified immunity in enforcing a no contact order between father and daughter put in place at the other parent's request).

## II. First Amendment Retaliation

Defendants also seek judgment in their favor as to Boyd's retaliation claim against defendants Reindl, Swiekatowski, Vandewalle, Baenen, and Foster, related to Boyd's August 27, 2013, letter that became the subject of Conduct Report 1796235.

### A. Personal Involvement

As an initial matter, defendants seek judgment as to Heil, Vandewalle, Baenen and Foster for lack of personal involvement. It is a "well established principle of law that a defendant must have been 'personally responsible' for the deprivation of the right at the

47

root of a § 1983 claim for that claim to succeed." *Backes v. Village of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)); *see also Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) ("For a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights.") (citation omitted).

Here, Reindl wrote the challenged conduct report and Swiekatowski held the hearing upholding it. On the other hand, Heil, Vandewalle and Foster appear to have had *no* involvement in reviewing the subject letter or the related conduct report proceedings, and Baenen's only involvement was *dismissing* the remaining charge against Boyd. Further, Boyd offers no evidence that these four defendants were involved in any way in the denial of the letter or punishing him for writing it. Accordingly, defendants Heil, Vandewalle, Foster and Baenen are entitled to judgment in their favor on this claim for lack of personal involvement, and the court will turn to the merit of this claim with respect to the remaining two defendants, Swiekatowski and Reindl.

## B.  Retaliation

"An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). To prove a retaliation claim under the First Amendment, Boyd must prove that: (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action. *Bridges v. Gilbert*,

557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  If a plaintiff makes this showing, then the burden shifts to the defendants to prove by a preponderance of the evidence that the same actions would have occurred even in the absence of protected conduct.  *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011). Defendants do not focus on the motivating factor element, and for good reason:  it is apparent that the content of Boyd's letter prompted both its censorship and the subsequent conduct report.  Still, defendants maintain that Reindl and Swiekatowski are entitled to summary judgment because (1) Boyd's speech was not protected by the First Amendment, (2) the denial was grounded in a legitimate reason, and (3) Boyd did not suffer a sufficiently adverse deprivation to implicate his First Amendment rights.  On this record, these arguments fail.

Defendants invoke the *Turner* standard in arguing both that the letter was not protected by the First Amendment and there was a legitimate basis to deny it.  It is unclear why defendants rely on *Turner*, since they acknowledge that the *Martinez* standard applies to the denial of the August 27, 2013, letter Boyd intended to send Zdeb.  Regardless, the court need not revisit whether this letter is constitutionally protected, since it has already concluded that prohibiting Boyd from sending the letter did not meet *Martinez*.

Along the same vein, defendants argue that Boyd's retaliation claim fails as a matter of law because there was a legitimate basis for Reindl to charge him with lying and disrespect:  her credibility and integrity.  However, the authority defendants cite for this proposition, *Brown v. Philips*, 801 F.3d 849, 855 (7th Cir. 2015), does not apply here.  In *Brown*, the plaintiff brought a retaliation claim challenging a universal ban on movies and

video games within his institution. *Id.* The Seventh Circuit agreed with the district court that the plaintiff's retaliation claim failed for multiple reasons -- one of which was that the universal ban on movies and video games had a legitimate basis. *Id.* However, in *Brown*, the *Turner* standard applied, so the court simply observed that the restriction on speech was justified. *Id.* (citing *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (en banc), and *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)). Accordingly, the reasoning in *Brown* does not apply, nor do defendants arguments with respect to the August 27, 2013, letter not being constitutionally protected or withheld for a legitimate reason.

Finally, to establish that the action taken against Boyd is sufficiently adverse to dissuade future protected activity, the prisoner must show the deprivation "would likely deter future First Amendment activity." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). Defendants argue that the issuance of a conduct report, which was after all ultimately dismissed, as well as Boyd's loss of 15 days of recreation, were not sufficiently adverse to support a retaliation claim. As support, defendants rely on two district court decisions: *Bullocks v. Mummert*, No. 1:18-cv-23, 2019 WL 3082332, at *3 (S.D. Ohio July 15, 2019), *report and rec. adopted*, No. 1:18-cv-23, 2019 WL 3501483 (S.D. Ohio Aug. 1, 2019); and *Gonzalez v. Currie*, No. 2:13-cv-201, 2014 WL 222353, at *5 (S.D. Tex. Jan. 21, 2014). In each of these cases, the court deemed the prisoner's punishment -- a loss of recreation time for five days (*Gonzalez*) and three weeks (*Bullocks*) -- too minimal to sustain a retaliation claim. However, these cases did not *also* involve the censorship of a letter itself. Rather, both cases involved punishment for filing a grievance. *Bullocks*, 2019 WL 3082332, at *3; *Gonzales*, 2014 WL 222353, at *14.

In fairness, the Seventh Circuit recognizes that "de minimus" deprivations amounting to mere inconveniences do not support a retaliation claim. *See Long v. Hammer*, 727 F. App'x 215, 217 (Mem) (7th Cir. June 15, 2018) (verbal harassment and requiring a prisoner to sign up for extra library time were insufficient to support a retaliation claim); *see also Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise"). But the law in this circuit also makes clear that the deprivation need not amount to a constitutional violation to support a retaliation claim. *See Holleman v. Zatecky*, 951 F.3d 973, (7th Cir. 2020) (noting, in the context of a prison transfer, that "'[c]onduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive'") (quoting *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) (false disciplinary charges supported retaliation claim even though overturned)); *Bridges*, 557 F.3d at 552, 554-55 (delays in incoming and outgoing mail, harassment by guard, unjustified disciplinary charges and improper dismissal of grievances sufficient to deter a prisoner of ordinary firmness).

Here, the combination of the deprivation of mail, the 15-day loss of recreation, and the fact that Boyd had to go through the appeals process before both charges against him were dismissed, would likely lead a reasonable fact finder to conclude that a prisoner of

ordinary firmness could be deterred from engaging in protected conduct again.[12] Accordingly, defendants are not entitled to judgment in their favor with respect to Boyd's First Amendment retaliation claim against Reindl and Swiekatowski.

If anything, like Boyd's free speech claim related to this letter, it appears as though judgment in *Boyd's* favor may be appropriate. Accordingly, the court will set further deadlines for the parties to set forth argument and proposed findings of fact with respect to whether Boyd is entitled to judgment in his favor on this claim under Rule 56(f).

## III. Next Steps

Assuming the parties' submissions confirm the court's impression that judgment in Boyd's favor on his First Amendment claims related to the August 27, 2013, letter is appropriate, that would leave a final issue at trial as to plaintiff's request for monetary relief. For reasons already discussed, Boyd's compensatory damages may well be limited to nominal damages because (1) he alleges no physical injury and (2) there is no suggestion that he suffered any economic harm with respect to the withheld letter and he lost 15 days of recreation time. *See* 42 U.S.C. § 1997e(e); *Calhoun v. DeTella*, 319 F.3d 936, 940-41 (7th Cir. 2003) (prisoners who succeed on First Amendment claims need no allege a

---

[12] Boyd also argues that he suffered physical, mental and emotional strain during this period of time. Defendants do not dispute the mental strain Boyd represents he suffered, instead arguing that his actions suggest his speech was not chilled since he continued to communicate with Zdeb during this time. All of this evidence is irrelevant to determining whether the deprivation would likely deter First Amendment activity, because the court must apply "'an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.'" *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). As such, a plaintiff's continued engagement in protected activity does not necessarily preclude a retaliation claim. *Id.* (citing *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (the retaliation standard "does not hinge on the personal experience of the plaintiff")).

physical injury because the "deprivation of the constitutional right is itself a cognizable injury," and thus § 1997e(e) would allow claims for nominal and punitive damages).

Punitive damages would also appear to be unavailable here, since Boyd would have to prove that a defendant acted with "evil motive or intent" or with "reckless or callous indifference "to his First Amendment rights. *Smith v. Wade*, 461 U.S. 30 (1983). While defendants Reindl's and Swiekatowski's actions with respect to Boyd's August 27, 2013, letter might well fail under the demanding *Martinez* standard, the record before the court does not suggest any action approaching this threshold. On the contrary, the evidence of record tends to support a conclusion that Reindl's and Swiekatowski's handling of the August 27, 2013, while likely unconstitutional, was the product of a misstep during a years-long process of appropriately policing the behavior of an extremely challenging prisoner. In context, this could *not* reasonably be construed as malice, bad faith, or even a reckless disregard of Boyd's constitutional rights. *See Wright v. Miller*, 561 F. App'x 551, 555-56 (7th Cir. 2014) ("[T]o award punitive damages, a jury must find that [the defendant] was 'motivated by evil intent' or acted with 'reckless or callous indifference' to [the plaintiff's] constitutional rights.") (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

Since the court is having difficulty seeing how a reasonable jury could award punitive damages with respect to the limited, arguable First Amendment violations, and defendants may be entitled to summary judgment in their favor on this remaining issue, the court will also ask the parties to submit argument and evidence on the availability of compensatory or punitive damages pursuant to Rule 56(f). If the evidence establishes that Boyd is not entitled compensatory or punitive damages, then the jury trial will not be

rescheduled, and the court will award Boyd $1 in nominal damages. *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999).

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #47) is GRANTED IN PART with respect to Boyd's First Amendment free speech claims related to the 2012 orders and amendments to those orders, and the March 13, 2013, April 8, 2013, October 14, 2013, October 15, 2013, April 2016, and May 24, 2016, mail denials, and DENIED IN PART with respect to Boyd's First Amendment free speech and retaliation claims against Swiekatowski and Reindl as to the August 27, 2013, mail denial and related conduct report.

2. Plaintiff Vincent Boyd's First Amendment claims against defendants Heil, Vandewalle, Baenen and Foster are DISMISSED with prejudice, and the clerk of court is directed to enter judgment in these defendants' favor at the close of this case.

3. Defendants' brief and supporting materials is due on or before **November 5, 2020,** as to:  (i) why this court should not enter judgment in Boyd's favor on his First Amendment free speech and retaliation claims related to his August 27, 2013, letter and related conduct report; and (ii) the availability of compensatory or punitive damages with respect to those claims.

4. Plaintiff Boyd's response on these remaining issues is due on or before **November 12, 2020.**  No reply will be permitted without advance leave of this court.

Entered this 23rd day of October, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge